ORIGINAL

Approved: _____
Peter J. Davis / Lara Pomerantz
Assistant United States Attorneys

Before:   THE HONORABLE ONA T. WANG      **20MAG-2732**
          United States Magistrate Judge
          Southern District of New York

------------------------------------X
                                    :
UNITED STATES OF AMERICA            :   SEALED COMPLAINT
                                    :
                                    :   Violations of 18 U.S.C.
            - v. -                  :   §§ 371, 875(c), and 2
                                    :
                                    :
DONNELL RUSSELL,                    :   COUNTY OF OFFENSE:
                                    :   NEW YORK
            Defendant.              :
                                    :
------------------------------------X

SOUTHERN DISTRICT OF NEW YORK, ss.:

Kerry C. Calnan, Special Agent, Federal Bureau of Investigation, being duly sworn, charges as follows:

### COUNT ONE

(Conspiracy to Threaten Physical Harm by Interstate Communication)

1. On or about December 4, 2018, in the Southern District of New York and elsewhere, DONNELL RUSSELL, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, threatening physical harm by interstate communication in violation of Title 18, United States Code, Section 875(c).

2. It was a part and object of the conspiracy that DONNELL RUSSELL, the defendant, and others known and unknown, placed an interstate telephone call to threaten physical harm to those attending a December 4, 2018 screening of "Surviving R. Kelly" at a venue in New York, New York called NeueHouse Madison Square ("NeueHouse"), in violation of Title 18, United States Code, Section 875(c).

Overt Acts

3.      In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.      On or about December 4, 2018, RUSSELL placed an interstate telephone call to NeueHouse threatening physical harm to those at the theater and attending the December 4, 2018 screening of "Surviving R. Kelly."

b.      On or about December 4, 2018, RUSSELL attempted to block his phone number and placed a phone call from his cellphone to a New York City Police Department ("NYPD") precinct located in New York, New York and in the vicinity of the theater set to screen "Surviving R. Kelly."

(Title 18, United States Code, Section 371.)

**COUNT TWO**
(Threatening Physical Harm by Interstate Communication)

4.      On or about December 4, 2018, in the Southern District of New York and elsewhere, DONNELL RUSSELL, the defendant, unlawfully, knowingly and intentionally, did transmit in interstate and foreign commerce a communication containing a threat to injure the person of another, to wit, RUSSELL placed an interstate telephone call to NeueHouse in New York, New York threatening physical harm to those attending the December 4, 2018 screening of "Surviving R. Kelly" at NeueHouse, and aided and abetted the same.

(Title 18, United States Code, Sections 875(c) and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

5.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"). During my tenure as a Special Agent with the FBI, I have conducted and participated in numerous investigations of criminal activity, including, but not limited to, threats in violation of Title 18, United States Code, Sections 875 and 2.

## Overview

6. Since in or about January 2019, law enforcement has been investigating the involvement of DONNELL RUSSELL, the defendant, and then-manager for music recording artist Robert Sylvester Kelly, better known as "R. Kelly," in a coordinated effort, including through the use of threats of violence, to prevent the screening in December 2018 of a multi-part documentary or "docuseries" entitled "Surviving R. Kelly" at NeueHouse, a theater in New York, New York (the "Screening"). The docuseries explores allegations that R. Kelly engaged in abusive sexual relationships with minor females and adult women.

7. Specifically, and as detailed below, throughout the day of the Screening, DONNELL RUSSELL, the defendant, who was at and around his residence in Chicago, Illinois, worked with, among others, another individual associated with R. Kelly ("CC-1") who was in New York the day of the Screening, to draft correspondence to an executive at the Lifetime television channel discouraging the executive from airing the docuseries. Additionally, RUSSELL admitted that he sent NeueHouse a "cease and desist" letter to stop the Screening from going forward. When that failed to stop the Screening, RUSSELL, using two different cellphones under his control, attempted to contact various law enforcement agencies in and around the theater, seemingly in a further effort to disrupt the Screening. Finally, RUSSELL contacted NeueHouse directly, via a landline associated with his home address, to threaten that there was a person in the theater with a gun prepared to shoot up the Screening (the "Threat Call"). At and around the time the Threat Call was placed, RUSSELL texted CC-1 that the "[t]he cops maybe[sic] coming soon." After receiving the Threat Call, the NeueHouse employee called 911. NeueHouse cancelled the Screening and evacuated the theater. Moreover, to conceal his involvement in the scheme, RUSSELL directed CC-1 to delete his text message to CC-1 regarding the police arriving at NeueHouse.

## Relevant Phone Numbers

8. Based on my participation in this investigation, including my review of phone records and search warrant returns, I have learned the following, among other things:

    a. DONNELL RUSSELL, the defendant, is the primary user of a cellphone assigned a call number ending in 5608 (the "Russell Cellphone") and a cellphone assigned a call number ending

in 3030 (the "IndyBuild Corp Cellphone").[1] RUSSELL is also the account holder listed on a landline phone associated with RUSSELL's home address in Chicago, Illinois (the "Russell Landline").[2]

        b.      CC-1 is the primary user of two cellphones, one assigned a call number ending in 8553 ("CC-1 Cellphone-1") and one assigned a call number ending in 5659 ("CC-1 Cellphone-2; collectively, the "CC-1 Cellphones").

### The Day of the Screening

      9.    Based on publicly available sources, interviews with, among others, an employee of NeueHouse, and my review of documents obtained from NeueHouse, I have learned that on or about December 4, 2018, NeueHouse, in collaboration with the Lifetime television channel, was scheduled to host the premiere screening of "Surviving R. Kelly." The docuseries explores allegations that R. Kelly engaged in unlawful sexual activity with numerous minor women and engaged in sexually, physically, and emotionally abusive relationships with several adult women. Guests to the Screening were expected to arrive at NeueHouse at approximately 6:30 p.m. on December 4, the Screening was to occur from approximately 7:00 p.m. to 8:30 p.m., with a panel discussion about the docuseries to be held following the Screening. The participants in the panel discussion were to include certain alleged victims of R. Kelly who

---

[1] Based on my review of phone records, I have learned that while RUSSELL is believed to be the primary user of both phones, there have been instances where the Russell Cellphone is in communication with the IndyBuild Corp Cellphone. However, the IndyBuild Corp Cellphone and the Russell Cellphone do not appear to communicate with each other on December 4, 2018, *i.e.*, the date of the Threat Call, and instead, as detailed herein, RUSSELL appears to have used both phones in furtherance of the scheme alleged herein.

Based on my review of phone records, I have learned that the Russell Cellphone is subscribed to in the name of "IndyBuild Corp," a company that is run by RUSSELL. Similarly, the IndyBuild Corp Cellphone is subscribed to in the name "INDYBUILD CORP." Additionally, the Russell Cellphone was seized from RUSSELL in or about July 2019, pursuant to a judicially authorized search warrant.

[2] Based on my participation in the investigation, including my review of phone records, I have learned, in substance and in part, that the "Can Be Reached" (or "CBR") number for the Russell Landline account is the IndyBuild Corp Cellphone.

4

appear in the docuseries.

      10. Based on my participation in the investigation, including my review of phone records, cell site records for the CC-1 Cellphones, a witness interview, and my review of search warrant returns, I have learned that CC-1 and a relative of CC-1 were in New York the day of the Screening.

### Cease and Desist Email to NeueHouse

      11. Based on my participation in the investigation, including my review of phone records, interviews with, among others, an employee of NeueHouse, and my review of documents obtained from NeueHouse, I have learned of the following communications on or about December 4, 2018, in substance and in part:

      a. From approximately 9:12 a.m. to approximately 2:47 p.m., DONNELL RUSSELL, the defendant, and CC-1 communicated repeatedly using the Russell Cellphone, the Russell Landline, CC-1 Cellphone-1, and by email. In substance and in part, RUSSELL and CC-1 discussed sending an email to an executive for original programing at Lifetime. The draft email expressed "concerns . . . regarding your upcoming Surviving R. Kelly production." The email further stated, in substance and in part, "By now, I'm certain you and your production team have met the acquaintance of the alleged survivors, and had ample time to witness the character of each woman and/or parent individually."

      b. From approximately 6:16 p.m. to approximately 7:06 p.m., RUSSELL, who was at and near his residence in Chicago at the time, called the number for the NeueHouse reception desk, which is available on the internet, using the Russell Cellphone and the IndyBuild Corp Cellphone. For example, at approximately 6:18 p.m., the IndyBuild Corp Cellphone called NeueHouse. That call lasted approximately six minutes and 38 seconds.

      c. Based on an interview of an individual working for NeueHouse ("Employee-1") on the evening of December 4, 2018, I am aware that Employee-1 answered a phone call at NeueHouse from the IndyBuild Corp Cellphone at approximately the time detailed in sub-paragraph (b), above. On that call, a person claiming to represent R. Kelly informed Employee-1 that he intended to serve a cease and desist letter on NeueHouse to prevent the screening of "Surviving R. Kelly." The caller stated, in substance and in part, that the caller was a representative of R. Kelly and that NeueHouse was to cease and desist in its screening of the docuseries.

d.  Subsequently, at approximately 6:58 p.m., a cease and desist letter was emailed to NeueHouse from a person purporting to be an attorney, demanding, in substance and in part, that NeueHouse not go forward with the Screening.

### RUSSELL asks CC-1 if the Screening Is Going Forward

12.  Based on my participation in the investigation, including my review of phone records, I have learned that shortly after the cease and desist letter was conveyed as described above, DONNELL RUSSELL, the defendant, and CC-1 made efforts to determine whether the Screening was going forward. Specifically, I have learned of the following communications on or about December 4, 2018, in substance and in part:

a.  At approximately 6:59 p.m., a cellphone associated with a relative of CC-1 called NeueHouse.

b.  At approximately 7:01 p.m., the Russell Cellphone called NeueHouse.

c.  From approximately 7:03 p.m. to 7:05 p.m., the Russell Cellphone and CC-1 Cellphone-1 were in communication by text and voice calls. For example, at approximately 7:04 p.m., after the cease and desist letter had been sent as described above, the Russell Cellphone texted CC-1 Cellphone-1, "Are they continuing with the screening." CC-1 replied, "Yes." As noted above, at the time, CC-1 was in New York.

### RUSSELL Calls the NYPD and the New York Fire Department Seemingly In an Effort to Disrupt the Screening

13.  Based on my participation in the investigation, including my review of phone records, historical cell site information, and public records, I have learned that following the efforts to disrupt the Screening by sending a cease and desist letter as described above, DONNELL RUSSELL, the defendant, made a series of phone calls to law enforcement located near NeueHouse. In particular, I have learned of the following communications that occurred on or about December 4, 2018:

a.  At approximately 7:12 p.m., the IndyBuild Corp Cellphone called a number for the NYPD Midtown South Precinct. I have learned that the NYPD Midtown South Precinct is located approximately 1.4 miles away from NeueHouse.

b.  At approximately 7:14 p.m., the Russell Cellphone called a number for the NYPD Transit District 4 Precinct.

I have learned that the NYPD Transit District 4 Precinct is approximately 0.6 miles away from NeueHouse. I have also learned that before making that call, RUSSELL attempted to block his number by dialing "*67." Based on my training and experience in analyzing phone records and my review of publicly available websites, I know that dialing *67 before making a call blocks the recipient of the call from seeing the number that made the call on the recipient's caller identification device. Historical cell site information for the Russell Cellphone shows that the Russell Cellphone was at or near Russell's residence in Chicago on the evening of December 4, 2018, and therefore Russell was not in New York or in a location where the NYPD could be of assistance.

        c.     At approximately 7:23 p.m., the IndyBuild Corp Cellphone called a number for the Fire Bell Club of New York (the "Fire Bell Club of New York Number"), which is an organization associated with the New York City Fire Department and is located approximately 0.3 miles from NeueHouse.

        d.     At approximately 7:25 p.m., the IndyBuild Corp Cellphone called a number for the New York City Fire Department Headquarters (the "FDNY Headquarters Number").

        e.     At approximately 7:27 p.m., the IndyBuild Corp Cellphone called the Fire Bell Club of New York Number.

        f.     At approximately 7:27 p.m., the IndyBuild Corp Cellphone called 311. Based on my review of publicly available sources, including the New York City website that lists the FDNY Headquarters Number, I have learned that the 311 is the general number for non-emergency services. Historical cell site information for the IndyBuild Corp Cellphone shows, in substance, that phone was also located at and around RUSSELL's residence in Chicago at or around the time the calls detailed above were placed.

<u>The Threat Call Is Made to NeueHouse from the Russell Landline</u>

        14.     Based on my review of text messages between CC-1 and DONNELL RUSSELL, the defendant, obtained by law enforcement, I have learned that on or about December 4, 2018 at approximately 7:36 p.m., RUSSELL, using the Russell Cellphone, texted CC-1, in substance, "The cops maybe [sic] arriving shortly."

        15.     Based on publicly available sources, interviews with, among others, an employee of NeueHouse, and my review of documents obtained from NeueHouse, I have learned the following, in substance and in part:

7

a. At approximately 7:37 p.m., Employee-1 received a phone call at NeueHouse from the Russell Landline. On that call, an individual said, in substance and part, that someone at the Screening had a gun and was going to shoot up the place.[3] By the time of the Threat Call, guests had already arrived for the Screening. Employee-1 relayed the threat to security guards working the event, as well as a manager for NeueHouse, and a 911 dispatcher. Ultimately, the Screening was canceled and guests were evacuated from the scene. No shooting ever occurred.

b. Based on my participation in this investigation, including my review of phone records, I have learned, in substance and in part, that on December 4, 2018, at approximately 7:37 p.m. and 7:38 p.m., the Russell Landline placed two phone calls to NeueHouse. The first phone call lasted approximately 23 seconds and the second call lasted approximately 20 seconds. Based on an interview of Employee-1, I believe that one of these calls was the Threat Call described above. As discussed above, historical cell site information for the Russell Cellphone places the Russell Cellphone at or near RUSSELL's residence and therefore the Russell Landline.[4]

### Communications after the Threat Call

16. Based on my review of text messages between CC-1 and DONNELL RUSSELL, the defendant, obtained by law enforcement, and my review of search warrant returns, I have learned that on or about December 4, 2018 at approximately 8:05 p.m., RUSSELL, using the Russell Cellphone, texted CC-1, in substance, "Delete those messages about 50." Based on my training and experience, and my participation in this investigation, I believe that "50" is a

---

[3] Employee-1 indicated that the voice of the person calling in the phone threat sounded different than the voice of the person who had previously called regarding the cease and desist letter. Employee-1 also indicated that he heard a click as if the person was calling from a landline, although he believed the caller who made the Threat Call may have been outside at the time of the call.

[4] Based on my training and experience, I know that cell site data, also known as "tower/face" or "tower/sector" information, reflects the cell tower and sector thereof utilized in routing any communication to and from the cellphone, as well as the approximate range of the cellphone from the tower during the communication. Because cell towers are often a half-mile or more apart, even in urban areas, and can be ten or more miles apart in rural areas, cell site data can provide general location information but is not as precise as precision location information.

reference to the police and that when RUSSELL wrote, "Delete those messages about 50," he was referring to the prior text message that RUSSELL had sent CC-1, which stated that the "cops maybe [sic] arriving shortly." Based on my review of search warrant returns for the Russell Cellphone, I believe that in addition to the direction to CC-1 described above, RUSSELL deleted these text messages from his own phone prior to the time law enforcement seized the Russell Cellphone in July 2019.

17. Based on my participation in the investigation, including my review of phone records and public records, I have learned of the following communications on or about December 4, 2018, in substance and in part:

a. The Russell Cellphone placed a phone call that lasted approximately six minutes to a cellphone used by R. Kelly at approximately 8:53 p.m.

b. At approximately 10:26 p.m., the CC-1 Cellphone-1 texted the Russell Cellphone, "911 . . . Call NOW." At approximately 10:34 p.m., the IndyBuild Corp Cellphone called CC-1 Cellphone-2. The call lasted approximately 23 minutes. CC-1 Cellphone-2 and the IndyBuild Corp Cellphone exchanged phone calls at approximately 11:20 p.m. and 11:48 p.m.

18. Based on my review of search warrant returns for the Russell Cellphone, public documents, and law enforcement databases, I have learned that the Russell Cellphone has a contact for RUSSELL's mother. I have also learned that on or about December 4, 2018, at approximately 11:20 p.m., RUSSELL's mother texted the Russell Cellphone, in substance: "Be humble when (if) you talk to Rob because you made another move without checking with him first. Even though, it was for his benefit, he might not approve of your actions!!!" I have also learned that, on or about December 5, 2018, RUSSELL's mother texted the Russell Cellphone, in substance: "My calls were to tell not to mention the woman's name that is assisting you. Remember, someone in Rob's circle may be a mole, so give her an alias!!!" Based on my participation in the investigation, I believe that RUSSELL's mother was referring to R. Kelly when directing RUSSELL to "[b]e humble when (if) you talk to Rob," and referring to CC-1 and the threat scheme described herein when directing RUSSELL to conceal the name of the "woman . . . assisting you."

RUSSELL and CC-1 Draft a Statement Regarding the Threat Call on December 6 and December 7, 2018

19. Based on my participation in this investigation, including my review of search warrant returns for the Russell Cellphone, I have learned the following, among other things:

a. On or about December 6, 2018, CC-1 texted the Russell Cellphone, in substance and in part: "You're going to love this plan . . . And this statement I just wrote." CC-1 subsequently texted a statement to the Russell Cellphone, which stated, in substance and in part:

> "The incident which took place at the recent Lifetime screening was most unfortunate, and we empathize with anyone who was affected by it. However, Mr. Kelly is once again being targeted and accused of acts beyond his control. For months, we have watched as his name has been slandered, and women he once cared for deeply, as well as his family, have attempted to assassinate his character for their own financial gain. As Mr. Kelly's team, we have urged him to speak up, but due to his selfless nature, good moral character and out of the love and respect he's had for his family and these women; especially his ex-wife and mother of his children, he has not wanted to retaliate, but everyone has their limits. For the record, Mr. Kelly (The Artist) will NEVER be muted, and now, Robert S. Kelly (The Man) will no longer be silenced. The truth will be revealed. Times up!"

b. On December 7, 2018, RUSSELL, using the Russell Cellphone, texted CC-1, in substance and in part, that "He wants to change the last sentence . . . He like everything else." Based on my participation in the investigation, I believe that RUSSELL was referring to R. Kelly in this message. RUSSELL subsequently texted CC-1, in substance and in part, "Damn, I see I got this one wrong." CC-1 responded, in substance and in part, "Someone who's passionate about genuinely helping could never be the wrong, but I digress." Based on my training and experience, and on my participation in this investigation, I believe that RUSSELL was referring to the threat scheme described above when he said, "Damn, I see I got this one wrong."

10

RUSSELL Admits He Contacted NeueHouse on December 4, 2018

20. On or about August 21, 2019, law enforcement agents conducted a voluntary interview of DONNELL RUSSELL, the defendant. After being advised of the identities of the interviewing agents and the nature of the investigation, RUSSELL stated the following, in substance and in part:

    a. RUSSELL wanted to figure out how to stop the docuseries from airing and sent a cease and desist letter to, among others, Lifetime and NeueHouse. RUSSELL sent the cease and desist letter to NeueHouse using both his personal and business email.

    b. CC-1 was in New York on the day of the Screening and RUSSELL was in contact with CC-1 that day, but RUSSELL denied making the Threat Call to NeueHouse.

21. Based on my participation in the investigation, including my review of search warrant returns for an iCloud account belonging to DONNELL RUSSELL, the defendant, I have learned of a recording of CC-1 speaking about R. Kelly. I have learned that on that recording, CC-1 said, in substance and in part, "Don [Russell] got identified as the person who called in the fucking gun threat which was stupid as fuck and Rob didn't know shit about it . . . they said the NYPD traced it back to him."

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of DONNELL RUSSELL, the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

_____
KERRY C. CALNAN
Special Agent
Federal Bureau of Investigation

Sworn to before me this
11th day of March, 2020

_____
THE HONORABLE ONA T. WANG
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

11